JOURNAL ENTRY AND OPINION
{¶ 1} Defendant-appellant, Larry Willis, appeals from an October 30, 2006 judgment of the Cuyahoga County Court of Common Pleas, finding him guilty of carrying a concealed weapon and sentencing him to one year of community control. For the following reasons, we affirm.
 {¶ 2} On November 2, 2005, the Cuyahoga County Grand Jury indicted Willis on one count of carrying a concealed weapon, a felony of the fourth degree, in violation of R.C. 2923.12. He entered a plea of not guilty to the charge. *Page 3 
 {¶ 3} On January 24, 2006, Willis moved to suppress evidence, alleging violations of his Fourth and Fourteenth Amendment rights. Prior to trial, however, Willis withdrew his motion.
 {¶ 4} Also prior to trial, Willis and the state stipulated to the following facts: the handgun in question was operational; and per ATF records, the handgun was purchased on March 3, 2005 by Thaddeus Shabbazz-el.
 {¶ 5} After Willis waived his right to a jury trial, the following evidence was adduced at the bench trial.
 {¶ 6} Officer William Mokshefsky of the Cleveland Police Department testified first for the state. He stated that he had been a police officer for approximately eight years. Officer Mokshefsky stated that on August 27, 2005, in the middle of the afternoon, he and Officer Erin O'Donnell were on routine patrol in a marked zone car. He explained that they received a radio call that shots had been fired in the area of East 71st Street and Hecker. The radio call further specified that the suspect was a black male, fleeing on foot, and wearing a white T-shirt.
 {¶ 7} Officer Mokshefsky testified that when he and Officer O'Donnell arrived at the scene, they were looking for anything suspicious, because if people are shooting, sometimes they will change their look, or "jump from the car and take off." They arrived at the scene in approximately five minutes and observed "a vehicle that appeared like it went around the block and returned back to the same area * * * as to maybe observe the area." He explained that this action "caught my partner *Page 4 
and I's attention." They then saw it "turn down a street at a fast rate" and "it made a quick turn when it noticed our zone car."
 {¶ 8} Officer Mokshefsky said they proceeded to follow the vehicle at a high rate of speed. They then observed that the vehicle, "[q]uickly tried to stop at a stop sign, make a quick left, never actually made a complete stop. Just pulled out on to the next street, which would have been Superior, went through that [red] light, and * * * kept going." At this point, around 79th and Superior, Officer Mokshefsky said they activated their overhead lights and sirens and initiated a traffic stop. Officer Mokshefsky also stated that Willis did not "immediately pull over-when we activated our lights and sirens." He said that it appeared as if Willis "would pull over, seem like he changed his mind, pull away, and then pulled over."
 {¶ 9} Officer Mokshefsky said his partner asked Willis, whom he identified in court as the driver, to provide her with his license and proof of insurance. Willis complied. Officer Mokshefsky said Willis become "very argumentative" with Officer O'Donnell at that time.
 {¶ 10} Officer Mokshefsky then noticed that Willis was "sweating profusely" and was "very argumentative and very nervous." Officer Mokshefsky explained that although it was August, it was only a "medium warm kind of day." He said it looked as if Willis "jumped out of a pool and into the car." He further described that it *Page 5 
looked "like he jogged around the block 18 times. He was sweating really bad, and this made us supsicious."
 {¶ 11} At that time, Officer Mokshefsky said he and his partner went back to their zone car and ran a LEADS report on Willis. They discovered that he had a prior conviction for carrying a concealed weapon.
 {¶ 12} He stated that based on his experience as a police officer, when a shooting or a crime occurs, the perpetrator sometimes returns to the scene of the crime immediately to observe what actually occurred, to see if police or other people have arrived, or to determine what damage he or she may have done. He explained that is why they were initially suspicious, because they saw Willis leave the scene and return. Then, when Willis saw the police car, they saw him make a quick turn, as if to get away from the police. Willis then sped away quickly, running stop signs and then a red light.
 {¶ 13} In addition, Officer Mokshefsky stated that it made them suspicious that Willis did not immediately pull over when they activated their lights, and when they saw that he was sweating so badly.
 {¶ 14} Officer Mokshefsky said they approached Willis again and asked him if they could search his car. He said that Willis adamantly told them, "[l]isten, I know my rights. You're not searching my car. I don't have to let you search my car." After that, Officer Mokshefsky stated they decided to call their supervisor. The *Page 6 
supervisor determined that based on "all the circumstances," they were going to search the vehicle.
 {¶ 15} Officer Mokshefsky said that Officer Riley found a loaded gun, with a round in the chamber, inside the glove compartment. Officer Mokshefsky identified the gun in court and explained that it was a Smith Wesson nine millimeter gun.
 {¶ 16} As soon as they discovered the gun, Officer Mokshefsky said they placed Willis into custody. Officer Mokshefsky explained that when they questioned Willis about the gun, he did not act surprised. He said Willis told them, "`Oh, that's my brother's gun. You know, he's in the military. I knew it was there.' This kind of deal, you know. Real relaxed about it."
 {¶ 17} On cross-examination, defense counsel asked Officer Mokshefsky how long it took Willis to pull over once they they activated their lights and sirens. He replied, "[m]aybe another half a block to a block. Yeah, a whole block before he even decided to pull over." He also testified that when Willis saw the police car and took off, he was "like, from 79 to 74 within seconds. He had to be laying on the gas. I'm talking about a NASCAR probably couldn't have gotten down that fast."
 {¶ 18} Officer Mokshefsky further stated that he remembered that the vehicle, a 2003 Lexus, was not registered to Willis.[1] He stated that the gun did not appear as if it had been recently fired. And he admitted that the police never discovered if *Page 7 
shots had actually been fired in the area and agreed that it was common to see young black males in that area wearing white tee-shirts.
 {¶ 19} Defense counsel asked Officer Mokshefsky if it had appeared that the gun had been recently fired. Officer Mokshefsky replied, "I don't think that was our concern whether or not he actually fired this weapon at that time because, see, we have a gang problem in that area, and he could have been responding back to help his boys, coming back to assist his friends. He may not have even had the opportunity to fire his firearm at that point yet."
 {¶ 20} Officer O'Donnell testified next. She corroborated Officer Mokshefsky's testimony, with the following differences. She explained that the radio broadcast gave conflicting descriptions of the suspect involved: "both were black males, white T-shirts, one stated possibly wearing sweat pants and one stated jeans. One stated a bike involved, the other one stated leaving on foot."
 {¶ 21} Officer O'Donnell said that when she walked up to the driver's side window, she told Willis that she had pulled him over because "he failed to stop at a couple stop signs, was driving at a high rate of speed, [and] told him that he also ran the red light at 79 and Superior." Willis responded that the light was yellow. Officer O'Donnell also stated that she told Willis why they were in the area and that he matched the description of a male they were searching for. Willis told her that he had "nothing to do with that." *Page 8 
 {¶ 22} After the gun was found, Officer O'Donnell testified that when they told Willis that they found the gun, he said, "open and freely that it was his brother's."
 {¶ 23} She said, in contradiction to Officer Mokshefsky, that the police did discover evidence of shots being fired in the area of East 71st Street and Hecker; i.e., casings were found on the ground in that area. However, no victims came forward, nor did anyone complain of damage to his or her home.
 {¶ 24} Officer O'Donnell then explained that Willis was cited for running the red light and for not wearing his seatbelt. She explained that she saw him in traffic court on these charges, to which he pled no contest. Over objection, she said that Willis had admitted in traffic court that "he had ran the lights, [and] admitted to knowing that the gun was in the vehicle."
 {¶ 25} On cross-examination, Officer O'Donnell admitted that she did not have any knowledge if the shell casings that were found were from a gun that had recently been fired.
 {¶ 26} The state then rested its case.
 {¶ 27} Willis first presented his mother, Belinda Willis. She explained that she had another son, Thaddeus Shabbazz-el, who was on active reserve in the army. She was aware that Shabbazz-el owned a handgun. She testified that she owned the 1992 Lexus, but stated that Shabbazz-el normally had possession of it and drove it. She explained that the car was only in her name for insurance purposes. *Page 9 
 {¶ 28} She said that when Willis was arrested in August 2005, her mother was in the hospital for open heart surgery. The whole family had come into town because of this and they stayed at her mother's home with her sister. She explained that "Larry, he came down with us also, and he stayed at my son Thaddeus' house," near "93rd and Chester."
 {¶ 29} She further explained on cross-examination that Willis was driving Shabbazzel's car because Willis' car was not driveable at that time.
 {¶ 30} Willis then took the stand in his own defense. At time of his arrest, he said that he lived with his mother in Solon. On that day, he was staying with his brother, Shabbazz-el, because his grandmother was in the hospital.
 {¶ 31} Sometime in the afternoon of August 27, 2005, he borrowed his brother's car, a 1992 Lexus, to go play basketball with his cousins at East High, which is at the corner of Superior and East 79th . He said that when the officers pulled him over, he was sweating because he had just gotten done playing basketball and it had started raining, which is why they quit playing. He was wearing a white T-shirt and "shorts under some jogging pants."
 {¶ 32} After the game, he went to his cousin's house on East 71st Street to change his clothes, but his cousin was not home. He then drove down East 79th Street to visit another cousin "who stays there." When he did not see them at home either, he turned around to go back to his brother's house, "[b]ack towards 93rd and *Page 10 
Chester." He denied that he was fleeing anything and denied being involved in, or hearing, a shooting.
 {¶ 33} He testified that he thought the light was yellow when he went through it. He explained that when Officer O'Donnell came up to his side window, she asked him what the hurry was. He replied, "there wasn't no hurry." She said, "you just ran that red light," and he said, "`[i]t wasn't red, it was changing yellow.' That was the argument she was talking about." He also said that when she asked for his license and insurance, he gave them to her immediately. He was insured to drive the Lexus.
 {¶ 34} Willis testified that he did not know his brother's gun was in the glove compartment. When the officers found the gun, Willis said he told them it was his brother's. Although Willis stated that he did not know the glove compartment was locked before Officer Riley searched it, Willis said he saw the officer take the keys out of the ignition to unlock it before the gun was found.
 {¶ 35} On cross-examination, Willis testified that he did not know exactly what time he left his brother's house on August 27, 2005, but it was sometime after 11:00 a.m. From there, he went to play basketball at East High for about an hour.
 {¶ 36} After Willis testified that he went to his cousins' houses on East 71st and 79th Streets, he was asked, "[y]ou said you made a decision you were going to go back to your brother's house, is that true?" Willis replied, "I guess I was going — I don't know." The state then asked, "[i]t's a simple question. Where were you going *Page 11 
that day?" Willis replied, "I ain't had nowhere. I had some running to do, to take the movies to my mother's house. I played basketball before I did all that, got a chance to take the movies to them." The state responded, "[s]o before the police stopped you, where were you heading?" Willis said, "[t]oward my grandmother's house." The state asked Willis if he was sure that was where he was going, and Willis replied, "[y]es, because I was on Superior."
 {¶ 37} Willis further explained that when the officers pulled him over and asked for his driver's license and proof of insurance, he said he had both of them on the visor of the Lexus. The insurance card was in his name and his mother's. Willis stated that he had only driven the Lexus a couple of times. When asked why did he have insurance on it then, Willis explained that it was because he was on his mother's insurance policy. Willis did not know whether his brother was also on the same policy.
 {¶ 38} Willis denied seeing the handgun before, but said that he knew it was his brother's gun because it was in his brother's car. He knew his brother had other guns too.
 {¶ 39} He admitted that he cannot purchase a gun because of his prior conviction, but denied that his brother bought the handgun for him.
 {¶ 40} The defense rested and moved for a Crim.R. 29 motion, which the trial court denied. *Page 12 
 {¶ 41} The trial court found Willis guilty of carrying a concealed weapon and sentenced him to one year of community control.
 {¶ 42} It is from this judgment that Willis appealed, raising three assignments of error:
 {¶ 43} "[1.] Appellant was denied effective assistance of counsel as guaranteed by Section 10, Article 1, of the Ohio Constitution and theSixth and Fourteenth Amendments to the United States Constitution when counsel withdrew the Motion to Suppress and thus failed to challenge the improper stop and improper search of Appellant.
 {¶ 44} "[2.] The state failed to present sufficient evidence that Appellant committed this crime.
 {¶ 45} "[3.] Appellant's conviction is against the manifest weight of the evidence."
 {¶ 46} In his first assignment of error, Willis argues that his trial counsel's withdrawal of the motion to suppress was ineffective assistance because "both the stop of [his] vehicle and especially the search of the vehicle were improper."
 {¶ 47} To succeed on a claim of ineffective assistance, a defendant must establish that counsel's performance was deficient and that the defendant was prejudiced by the deficient performance. Strickland v.Washington (1984), 466 U.S. 668, 687; State v. Bradley (1989),42 Ohio St.3d 136. Counsel will only be considered deficient if his or her conduct fell below an objective standard of *Page 13 
reasonableness. Strickland at 688. When reviewing counsel's performance, this court must be highly deferential and "must indulge a strong presumption that counsel's conduct f[ell] within the wide range of reasonable professional assistance." Id. at 689. To establish resulting prejudice, a defendant must show that the outcome of the proceedings would have been different but for counsel's deficient performance. Id. at 694.
 {¶ 48} Failure to file — or a withdrawal of — a motion to suppress is not per se ineffective assistance of counsel. State v. Madrigal (2000),87 Ohio St.3d 378, 389, quoting Kimmelman v. Morrison (1986),477 U.S. 365, 384. "Failure to file a motion to suppress constitutes ineffective assistance of counsel only if, based upon the record, the motion would have been granted." State v. Kuhn, 9th Dist. No. 05CA008859,2006-Ohio-4416, at _11, citing State v. Robinson (1996),108 Ohio App.3d 428, 433.
 {¶ 49} Thus, this court must examine the facts and determine if the motion to suppress would have been granted. If so, then Willis' trial counsel was ineffective in withdrawing it prior to trial.
 {¶ 50} Willis first argues that the initial stop of his vehicle violated the Fourth Amendment. We disagree.
 {¶ 51} The Fourth Amendment of the United States Constitution, as well as Article One, Section Fourteen, of the Ohio Constitution, guarantee "the right of the *Page 14 
people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." When a police officer stops an automobile and detains its occupants, a "seizure" is committed within the meaning of the Fourth and Fourteenth Amendments of the United States Constitution. Delaware v. Prouse (1979), 440 U.S. 648, paragraph two of the syllabus.
 {¶ 52} It is well established that an officer may stop a motorist upon his or her observation that the vehicle in question violated a traffic law, regardless of the how minor the offense or the officer's motivation in making the stop (i.e., pretextual stop). Whren v. United States
(1996), 517 U.S. 806, 819; Dayton v. Erickson (1996), 76 Ohio St.3d 3,11-12. As one commentator put it, "[t]here is no detail of driving too small, no piece of equipment too insignificant, no item of automobile regulation too arcane to be made the subject of a traffic offense." David A. Harris, "Driving While Black" and All Other Traffic Offenses: The Supreme Court and Pretextual Traffic Stops (1997), 87 J. Crim. L. Criminology 544, 553-554.
 {¶ 53} Although the officers here testified that they suspected criminal activity when Willis came back around the block, they nevertheless pulled him over because they witnessed him speeding, running a stop sign, and running a red light. Thus, *Page 15 
there is no question that the officers had probable cause to make the initial traffic stop.
 {¶ 54} Any further detention or search of the vehicle, however, beyond what was related to the purpose of the original stop, must be based on articulable facts that give rise to a reasonable suspicion of criminal behavior. See State v. Robinette (1997), 80 Ohio St.3d 234, paragraph one of the syllabus. Thus, the central issue here is whether the warrantless search of the vehicle and the glove compartment violated Willis' Fourth Amendment rights.
 {¶ 55} In Terry v. Ohio (1968), 392 U.S. 1, 21, the Court set forth the constitutional standard for an investigative search. The Court held that a police officer may investigate unusual behavior, when he or she reasonably concludes that the individual is engaged in criminal activity. In assessing that conclusion, the officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Id. at 21. Furthermore, the standard against which the facts are judged must be an objective one: "[W]ould the facts available to the officer at the moment of the seizure or the search `warrant a man of reasonable caution in the belief that the action taken was appropriate?" Id. at 21-22.
 {¶ 56} In State v. Andrews (1991), 57 Ohio St.3d 86, the Ohio Supreme Court explained: *Page 16 
 {¶ 57} "Since Terry, courts have struggled with the elusive concept of what comprises a reasonable suspicion that someone is engaging in, or about to engage in, criminal activity. `Terms like "articulable reasons" and "founded suspicion" are not self-defining; they fall short of providing clear guidance dispositive of the myriad factual situations that arise.' Fleshing these terms out, courts have concluded that an objective and particularized suspicion that criminal activity was afoot must be based on the entire picture — a totality of the surrounding circumstances. Furthermore, these circumstances are to be viewed through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold. A court reviewing the officer's actions must give due weight to his experience and training and view the evidence as it would be understood by those in law enforcement." (Internal citations omitted.)
 {¶ 58} Therefore, this court must look to the totality of the circumstances in the present case in order to determine if the continued detention and search were justified.
 {¶ 59} Two police officers testified to essentially the same scenario. They were called to a scene where shots had been reported. When they arrived, they noticed a vehicle circle around the block. Officer Mokshefsky testified that based on his years of experience as a police officer, this caught his attention because he knew that criminals sometimes return to the scene of a crime immediately after it occurs. When Willis saw their marked car, he made a quick turn and sped off, at a *Page 17 
"NASCAR" pace, running a stop sign and a red light. Finally, Willis appeared hesitant to pull his vehicle over after they activated their lights and sirens.
 {¶ 60} In addition, Willis matched the description of the male they were looking for. Willis was "very argumentative" and "very nervous." He was unusually "sweaty." In fact, Officer Mokshefsky testified that although it was not a hot day, Willis was sweating so badly, it appeared as if he had "jumped out of a pool" or had "jogged around the block 18 times." Since the radio had reported that a man had been fleeing on foot, this also raised their suspicions. Then, when they ran the LEADS report and discovered that Willis had a prior carrying a concealed weapons conviction, that is when they decided to call their supervisor, who made the determination to search the vehicle.
 {¶ 61} If this court only looked at each factor individually, as articulated by the officers, some are readily susceptible to an innocent explanation. However, we cannot view the factors in isolation.Terry, supra, at 22 (each of the series of acts was "perhaps innocent in itself); see also United States v. Sokolow (1989), 490 U.S. 1, 7
(holding that factors which by themselves "were quite consistent with innocent travel, collectively amounted to reasonable suspicion).
 {¶ 62} In United States v. Arvizu (2002), 534 U.S. 266, the Court reasoned that "[a] determination that reasonable suspicion exists * * * need not rule out the possibility of innocent conduct." Id. at 754, citing Illinois v. Wardlow (2000), 528 U.S. 119, 125. The Court concluded, "[undoubtedly, each of these factors alone is *Page 18 
susceptible to innocent explanation, and some factors are more probative than others. Taken together, we believe they sufficed to form a particularized and objective basis for [the investigative stop], making the stop reasonable within the meaning of the Fourth Amendment." Id. at 277-278.
 {¶ 63} Viewing the totality of the circumstances in the case sub judice, we conclude that the officers did not violate Willis'Fourth Amendment rights. The factors, when viewed collectively, taking into account the officers' experience and training, objectively show a reasonable suspicion that "criminal activity [was] afoot."Terry at 30. Therefore, the search was warranted.
 {¶ 64} Accordingly, Willis' motion to suppress would not have been granted, and Willis' counsel was not ineffective for withdrawing it. Willis' first assignment of error is not well taken.
 {¶ 65} In his second assignment of error, Willis argues that the state failed to present sufficient evidence that he was guilty of carrying a concealed weapon. Specifically, Willis maintains that there was "absolutely no evidence that Appellant had knowledge that the gun was in the glove compartment." We disagree.
 {¶ 66} An appellate court's function in reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. State v. Jenks (1991), *Page 19 61 Ohio St.3d 259, paragraph two of the syllabus. "In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law." State v. Thompkins (1997),78 Ohio St.3d 380, 386. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jenks at 273.
 {¶ 67} Thus, this court must determine if the state presented sufficient evidence to prove beyond a reasonable doubt that Willis was guilty of carrying a concealed weapon. R.C. 2923. 12(A)(2) provides in relevant part, "No person shall knowingly carry or have, concealed on the person's person or concealed ready at hand * * * a handgun."
 {¶ 68} In support of his argument that the state failed to present evidence sufficient to establish the knowledge element, Willis points to the following facts. The car belonged to his mother. The purchase receipt proved that the gun belonged to his brother. Willis did not make any furtive movements toward the glove compartment. And there was no evidence that the gun had recently been fired.
 {¶ 69} We disagree with Willis that these facts affirmatively show his lack of knowledge. First, the facts have nothing to do with the elements of R.C. 2923.12(A). These facts, that his mother owned the car, his brother normally drove it and owned the gun, do not show that Willis did not know that the gun was in the glove compartment. The statute says nothing about ownership. Moreover, under the *Page 20 
statute, the gun does not have to have been recently fired. In addition, just because Willis did not make a furtive movement toward the glove compartment does not mean he did not know the gun was there.
 {¶ 70} Viewing the evidence in a light most favorable to the prosecution, this court concludes that sufficient evidence was set forth to prove that Willis was aware that the gun was in the glove compartment. The state presented Officer Mokshefsky, who testified that when the officers confronted Willis with the handgun, Willis said that it was his brother's gun, and that he knew it was there. Under the sufficiency standard, that alone would have been enough evidence to prove knowledge beyond a reasonable doubt. But the state also presented additional evidence of knowledge, through Officer O'Donnell. She testified that Willis admitted in traffic court that he was aware that the gun was in the glove compartment. It was also undisputed that Willis was driving the car, in close proximity to the concealed handgun. Therefore, it is this court's view that the evidence presented by the state was sufficient to support the fact finder's guilty verdict as a matter of law.
 {¶ 71} As such, Willis' second assignment of error lacks merit.
 {¶ 72} In his third assignment of error, Willis argues that his guilty verdict was against the manifest weight of the evidence. In a one paragraph argument, he maintains that "a manifest miscarriage of justice occurred" because of the lack of evidence. We disagree. *Page 21 
 {¶ 73} With respect to manifest weight of the evidence, inThompkins, the Supreme Court explained:
 {¶ 74} "[although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence. * * * Weight of the evidence concerns `the inclination of thegreater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the trier of fact that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.' (Emphasis added.) Black's, supra, at 1594.
 {¶ 75} "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a `thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony. * * * `The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised *Page 22 
only in the exceptional case in which the evidence weighs heavily against the conviction.')." Thompkins, supra, at 387. (Internal citations omitted.)
 {¶ 76} With this standard in mind, it is our view that this was not such an exceptional case that it rose to the high level of "manifest miscarriage of justice." Although Willis presented evidence which showed that his brother normally drove the car and that the gun was purchased by his brother, those facts do not definitively dispute the fact that Willis did not know the gun was in the glove compartment. Willis was driving the car, which he was specifically insured for, with the gun in the glove compartment.
 {¶ 77} Although Willis testified at trial that he was unaware that the gun was in the glove compartment, Officer Mokshefsky testified that Willis said that he knew the gun was in there, but that it was his brother's. It was entirely within the factfinder's discretion to determine which witness was more credible. Thus, the factfinder was free to believe the police officer's testimony over Willis'. Willis contradicted himself several times during the trial, including the actual time he borrowed his brother's car and as to the place he was headed after he discovered that both of his cousins were not at home (grandmother's or brother's).
 {¶ 78} Therefore, Willis' third assignment of error is overruled.
 {¶ 79} As such, the judgment of the Cuyahoga County Court of Common Pleas is affirmed.
 It is ordered that appellee recover from appellant costs herein taxed. *Page 23 
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to
Rule 27 of the Rules of Appellate Procedure.
SEAN C. GALLAGHER, P.J., CONCURS; CHRISTINE T. MCMONAGLE, J., CONCURS IN JUDGMENT ONLY
[1] Willis and his mother both testified that the vehicle was a 1992 Lexus. *Page 1